1

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8

9

10   MICHAEL SONNER,                          )

11                    Petitioner,             )        2:00-cv-01101 KJD-CWH
                                              )
12   vs.                                      )
                                              )
13   TIMOTHY  FILSON,[1] *et al.*,            )        **ORDER**
                                              )
14                    Respondents.            )
                                              )
15   _____/

16        Before the court for a decision on the merits is an application for a writ of habeas corpus filed

17   by Michael Sonner, a Nevada prisoner sentenced to death.  ECF No. 96.

18        I. FACTUAL AND PROCEDURAL BACKGROUND

19        In an opinion affirming Sonner's conviction and sentence, the Nevada Supreme Court

20   recounted the factual background of this case:

21              On the evening of November 30, 1993, a red sport utility vehicle stopped at the
           Trinity Truck Stop at the junction of Interstate 80 and Highway 95, twenty-three miles
22         west of Lovelock.  After pumping $22.00 worth of gas, the driver left without paying.

23              Trooper Carlos Borland was alerted to what had occurred at the truck stop and
           eventually halted the red Chevy Blazer near Lovelock.  Prior to the stop, the Chevy
24         Blazer and Borland's patrol car both passed Steven and Doyle Anderson.  As the
           Andersons approached the patrol car and the Blazer, Steven Anderson saw Trooper

25

26   _____

        [1]  Timothy Filson is automatically substituted for Renee baker as the Warden of Ely State Prison.
     Fed. R. Civ. P. 25(d).

Borland lying on the ground and the Blazer pulling away from the shoulder. The Andersons stopped to help the stricken officer. Another passing motorist, Jerold Burkhart, also saw the Blazer speed away. Burkhart stopped and used Borland's radio to summon help. Borland was transported by ambulance to the Pershing General Hospital emergency room where doctors vainly attempted to stabilize him before he succumbed to a gunshot wound to the head. The Andersons and Burkhart testified that Borland's pistol was still in its holster.

On December 1, 1993, a stolen red Chevy Blazer was found abandoned in Churchill County. Shoe prints were observed leading away from the vehicle in the direction of the Clan Alpine Mountains. A helicopter reconnaissance team eventually saw what appeared to be a campfire several miles from the Blazer. A S.W.A.T. team landed, and a standoff ensued during which Sonner appeared suicidal when he raised his weapon in the direction of the officers in an attempt to draw their fire. The officers fired two shots, and although Sonner was not hit, he dropped his gun and surrendered. At trial, Sonner never disputed that he killed Trooper Borland. A jury convicted Sonner of first-degree murder with use of a deadly weapon and sentenced him to death.

*Sonner v. State*, 930 P.2d 707, 710-11 (Nev. 1996). In a subsequent opinion, issued after a rehearing and still affirming the conviction and sentence, the Nevada Supreme Court set forth further background information regarding Sonner's trial and sentencing:

Sonner was tried in September 1994. The jury found him guilty of one count each of first-degree murder with use of a deadly weapon, ex-felon in possession of a firearm, possession of a stolen vehicle, and resisting a public officer. At the penalty hearing, the state presented evidence that Sonner had been convicted of robbery and assault with a deadly weapon on a peace officer in North Carolina, was a fugitive from North Carolina, had robbed and raped a woman in Virginia, and had shot to death two people in Texas. His presentence report showed that he had eleven prior felony convictions.

The jury found that the murder was committed under five aggravating circumstances: Sonner was under sentence of imprisonment; Sonner had previously been convicted of two felonies involving the use or threat of violence (each prior conviction was listed as a separate aggravating circumstance); the murder was committed to avoid or prevent a lawful arrest or to effect an escape from custody; and the victim was a peace officer, which Sonner knew or reasonably should have known, killed while engaged in the performance of his official duty. The jury found four mitigating circumstances: the murder was committed while Sonner was under the influence of extreme mental or emotional disturbance; he was subject to neglect as a child; he was subject to abuse as a child; and he had never denied culpability for his criminal conduct. The jury returned a sentence of death. The district court also adjudicated Sonner a habitual criminal.

On October 28, 1994, the district court entered a judgment of conviction and sentenced Sonner to death for the murder, a consecutive prison term of six years for ex-felon in possession of a firearm, a consecutive term of life in prison without possibility of parole for possession of a stolen vehicle and habitual criminality, and a

2

consecutive prison term of six years for resisting a public officer.

*Sonner v. State*, 322, 955 P.2d 673, 674 (Nev. 1998)

After the Nevada Supreme Court affirmed his conviction and sentence, Sonner's petition for a writ of certiorari to the United States Supreme Court was denied on October 5, 1998. *Sonner v. Nevada*, 525 U.S. 886 (1998).

On January 8, 1999, Sonner filed a petition for a writ of habeas corpus in the state district court. On September 29, 1999, the state district court denied that petition, and on June 9, 2000, the Nevada Supreme Court dismissed Sonner's appeal. The Nevada Supreme Court issued its remittitur on July 6, 2000.

Sonner initiated this federal habeas corpus action on September 11, 2000, by submitting his initial federal petition to the court and paying the filing fee. ECF Nos. 1 and 2. On October 19, 2000, the court granted Sonner's motion to proceed *in forma pauperis* and his motion for appointment of counsel, and directed the clerk to file his petition. ECF Nos. 3-5. Counsel undertook representation on April 23, 2001. ECF No. 12.

Discovery proceedings (first informal, then formal) ensued and did not conclude until October of 2004. On January 3, 2006, Sonner filed an amended petition for a writ of habeas corpus. ECF No. 96. On June 5, 2006, respondents filed a motion to dismiss (ECF No. 103) asserting that many of the claims in the amended petition are barred by the statute of limitations, that many of the claims in the amended petition are unexhausted in state court, and that certain claims in the amended petition are not cognizable in this federal habeas corpus action. Sonner responded by filing a motion for stay and abeyance (ECF No. 108), which the court granted (ECF No. 113).

From December 21, 2006, to January 9, 2012, proceedings were stayed to allow Sonner to exhaust state court remedies for claims contained in his amended petition. ECF Nos. 113-128. During the stay, Sonner returned to state district court and filed a second state habeas petition on February 1, 2007. The state district court determined that only four of Sonner's claims were properly

before the court and ordered him to file an amended petition containing only those four claims. The district court ultimately found those claims to be without merit. On appeal, the Nevada Supreme Court affirmed the lower court's decision to deny relief, but concluded that all of Sonner's claims were procedurally barred as untimely under Nev. Rev. Stat. § 34.726(1) and successive under Nev. Rev. Stat. § 34.810(1).

As noted, proceedings were reopened in this case on January 9, 2012. ECF No. 128. On March 26, 2013, pursuant to respondents' motion to dismiss (ECF No. 132), this court dismissed several of Sonner's claims as time-barred. ECF No. 170.

On May 10, 2013, the respondents filed their answer to Sonner's remaining habeas claims. Briefing on the merits of those claims concluded on January 6, 2014. On May 14, 2014, this court entered an order denying Sonner's motion for leave to conduct discovery, motion for evidentiary hearing, and motion for stay and abeyance, but conditionally granting his motion for leave to expand the record.

II. STANDARDS OF REVIEW

This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state

court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. In *Pinholster*, the Court reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made," and, therefore, the record under review must be "limited to the record in existence at that same time, i.e., the record before the state court." *Id*. at 182. "[A]

5

federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller-El*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim *de novo* without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting that federal court review is *de novo* where a state court does not reach the merits, but instead denies relief based on a procedural bar later held inadequate to foreclose federal habeas review). In such instances, however, the provisions of 28 U.S.C. § 2254(e) still apply. *Pinholster*, 563 U.S. at 185-86 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."); *Pirtle*, 313 F.3d at 1167-68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is *de novo*). Irrespective of whether the AEDPA standard applies, federal courts can deny relief based on *de novo* review because such review is more favorable to the petitioner. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

### III.  ANALYSIS OF CLAIMS

**Claim G**

In Claim G, Sonner claims his constitutional rights were violated by virtue of the state trial court's denial of his motion for further psychiatric testing. Sonner's defense at trial was that he was not guilty by reason of insanity. Prior to trial, Sonner's counsel filed a motion asking the trial court to authorized the expense of conducting a magnetic resonance imaging scan (MRI), electroencephalogram (EEG), and an evoked potential electroencephalogram (Evoked EEG) on the

6

grounds that the defense's efforts "to detect an organic basis for his insanity defense through psychological testing have been unsuccessful and that the requested [tests] may reveal organic brain damage which cannot be detected through psychological testing." ECF No. 205-14, p. 2.[2]  The trial court authorized only the EEG as a screening test to determine whether additional testing was warranted.  ECF No. 205-19, p. 11 and ECF No. 205-20, p. 2.

Near the conclusion of jury selection, Sonner's counsel filed a motion asking the trial court to authorize "the expense of 'EEG' testing utilizing nasopharyngeal leads and the obtaining of a 'sleep record' of the Defendant along with a positron emission tomography (PET) scan of the Defendant's brain on the ground that such testing is necessary to evaluate whether Defendant's brain contains areas of damage."  ECF No. 206-19, p. 2.  The trial court denied the motion, finding that the tests were not reasonably necessary to rule out the possibility of organic brain damage.  ECF No. 207-16, p. 10.

Sonner presented Claim G to the Nevada Supreme Court in his direct appeal.  ECF No. 211-17, p. 23-25.  The Nevada Supreme Court decided the claim as follows:

> On the eve of trial, after the jury had been empaneled, Sonner moved the district court for leave to perform further testing for organic brain damage to support an insanity defense, even though prior to Sonner's motion, he was examined by three psychiatrists.  The district court denied the motion, ruling that further testing was not reasonably necessary for a proper diagnosis of organic brain damage.  The court's decision was based in part on an affidavit from a neurologist who felt that subjecting Sonner to additional tests was unnecessary because EEG's and a BAER test taken a few days previously revealed no organic brain damage.
>
> Sonner contends that he was entitled to the requested tests under NRS 7.135[7] and that he has a due process right to prove that he was insane at the time he killed Borland, *see Ake v. Oklahoma*, 470 U.S. 68, 82-83, 105 S.Ct. 1087, 1095-96, 84 L.Ed.2d 53 (1985); *Lickey v. State*, 108 Nev. 191, 194, 827 P.2d 824, 828 (1992).  Although Sonner was entitled to attempt to prove his theory of defense, the law does not require an unlimited expenditure of resources in an effort to find professional support for his theory.  Sonner was examined by three psychiatrists; he was thus provided with a reasonable level of expert assistance.  *See Pertgen v. State*, 105 Nev. 282, 284, 774 P.2d 429, 430-31 (1989) ("Nothing in the *Ake* opinion suggests that a State is constitutionally obligated to provide a defendant as many psychiatrists as it takes to come up with one who will proclaim the defendant insane at the time of his

_____

[2]  References to page numbers for documents in the court's electronic docket are based on CM/ECF pagination.

offense.").

> In order to obtain testing beyond that provided by the first three psychiatrists, Sonner had to demonstrate a need for such testing. *See State v. Second Judicial Dist. Court*, 85 Nev. 241, 244, 453 P.2d 421, 423-24 (1969). We conclude that Sonner failed to demonstrate such a need, and, moreover, the affidavit submitted in response to the motion indicated that there was no need for additional testing.

---

> [7] NRS 7.135 provides:
>
> > The attorney or attorneys appointed by a magistrate or district court to represent a defendant are entitled, in addition to the fee provided by law for their service, to be reimbursed for expenses reasonably incurred by him or them in representing the defendant and may employ, subject to the prior approval of the magistrate or district court in an ex parte application, such investigative, expert or other services as may be necessary for an adequate defense.

*Sonner v. State*, 930 P.2d 707, 714-15 (Nev 1996).

There is no dispute here that *Ake* is the clearly established federal law controlling the disposition of Ground G. In *Ake*, the U.S. Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. The Ninth Circuit has construed narrowly the right created by *Ake*, noting that it is limited to the provision of *one* competent psychiatrist and questioning whether federal courts are even permitted to define what constitutes an *appropriate* examination. *See Leavitt v. Arave*, 646 F.3d 605, 610 (9th Cir. 2011) (quoting *Ake*, 470 U.S. at 79, 105 S.Ct. 1087). Indeed, the court in *Leavitt* held that, under *Ake*, a "defendant 'lacks the right to appointment of a second psychiatrist,' even where the first psychiatrist is alleged to be incompetent or reaches a diagnosis unfavorable to the defense." *Id.* (quoting *Pawlyk v. Wood*, 248 F.3d 815, 824 (9th Cir. 2001)).

No controlling legal authority dictates that Sonner was entitled to neurological testing beyond what the trial court authorized in this case. Moreover, even the expert who Sonner relied upon in

asking the trial court for more testing opined that, even with the additional tests, "the probability of demonstrating any significant abnormalities is not high." ECF No. 206-19, p. 9. And, because "the trial court took careful steps to ensure that it made an informed decision" on the need for additional testing, this case is on all fours with *Vickers v. Stewart*, 144 F.3d 613 (9th Cir. 1998), where the Ninth Circuit concluded that the petitioner's rights under *Ake* were not violated by the trial court's denial of additional diagnostic testing. 144 F.3d at 615-16.

Claim G is denied.

**Claim H**

In Claim H, Sonner claims his constitutional rights were violated because the state trial court improperly denied his motions to control pretrial publicity and for a change of venue. With the former motion, Sonner asked the trial court to issue an order that would (1) seal the file and close all proceedings prior to jury sequestration, (2) exclude the public and media from all pretrial hearings, (3) prohibit all persons connected with the prosecution and investigation of the case from extrajudicially releasing information to the media, (4) direct that all records and transcripts be sealed until a jury is impaneled and sequestered; and (5) prohibit the use of video or other cameras during the court proceedings. ECF No. 204-8. The court granted the request with respect to sealing all transcripts and records until the jury was impaneled and directed the attorneys and parties to comply with Nevada Supreme Court Rule 177 regarding trial publicity. ECF No. 205-19, p. 3-4. The court denied the request to exclude the press, but ordered that Sonner could renew this motion if an ongoing problem became apparent. *Id*. The other requests in the motion were denied. *Id*.

Sonner filed the motion for change a venue toward the end of jury selection. ECF No. 206-20 through 24. He attached to the motion a "Change of Venue Study" included a survey of 350 eligible jurors in Pershing County. ECF No. 206-20. The reported results of the survey included the following:

> (1) 94% of the residents had seen or heard something about Trooper Borland being shot,

1       (2) 90% had seen or heard something about petitioner,

2       (3) 70% had discussed petitioner's case with family members or friends,

3       (4) 57% believed the information and discussions affected their opinion of petitioner's
                guilt,
4
        (5) 53% would automatically impose the death penalty upon finding of guilt, and
5
        (6) 25% believed they could not find petitioner not guilty by reason of insanity – even
6               if convincing evidence was presented that he was insane.

7
*Id.*, p. 6.  Also included with the motion were approximately 100 newspaper articles about the case
8
and a declaration indicating that local television stations in Reno, Nevada, had broadcast
9
approximately 100 new reports about the case.  ECF No. 206-20 through 24.  In denying the motion,
10
the trial court interpreted the survey to indicate that half the members of the community could be fair
11
and impartial in deciding the case and noted that a significant number of the jurors did not know the
12
alleged victim, that there was nothing that could be "characterized as a circus atmosphere about the
13
press coverage," that no television cameras were present in court during jury selection after the first
14
day, and that jury selection process had been lightly attended by the public.  ECF No. 208-13.
15
        Sonner presented Claim H to the Nevada Supreme Court in his direct appeal.  ECF No. 211-
16
17, p. 2-10.  The Nevada Supreme Court decided the claim as follows:
17
                The issue of whether to change trial venue is within the sound discretion of the
18      trial court and will not be disturbed unless there is a clear abuse of discretion.  *Rogers
        v. State*, 101 Nev. 457, 462, 705 P.2d 664, 668 (1985).  Additionally, a defendant
19      seeking a change of venue must present evidence showing the extent of inflammatory
        pretrial publicity and that such publicity corrupted the trial.  *Id*.
20
                Despite Sonner's detailed account of media reports and statistics reflecting bias
21      within the venire, he has utterly failed to demonstrate actual bias on the part of the jury
        empaneled to decide his fate.  Moreover, the jurors assured the district court that they
22      would be fair and impartial in their deliberations.  This court previously has upheld the
        denial of motions for change of venue based upon such assurances even where pretrial
23      publicity has been pervasive.  *See Ford v. State*, 102 Nev. 126, 129, 717 P.2d 27, 30
        (1986); *Gallego v. State*, 101 Nev. 782, 785, 711 P.2d 856, 859 (1985); *Kaplan v.
24      State*, 96 Nev. 798, 801, 618 P.2d 354, 356 (1980).

25              In the extensively covered "sex slave" case, *Gallego*, also tried in a small
        community, we observed:
26
                                                10

> Given the realities of our age, it is unlikely that a high-profile criminal
> defendant will be presented with a venire of uninformed individuals
> from which to select a jury. Indeed, it is conceded by many jurists that
> such a panel would least likely provide the considered, enlightened
> judgment that can best serve the demands of trial.

*Gallego*, 101 Nev. at 785, 711 P.2d at 859. We also noted that extensive pretrial media coverage of high-profile criminal cases will likely penetrate every "nook and cranny" of our state capable of hosting such trials. Therefore, the real test in each case is whether jurors who may have harbored preconceived notions of guilt or innocence prior to their call to jury service, can set aside such notions and fairly and impartially render a verdict based upon the trial evidence. *See id.* at 785–86, 711 P.2d at 859.

Because Sonner was unable to demonstrate actual prejudice resulting from pre-trial publicity, he insists that this court must presume prejudice based upon the facts of his case. The presumed prejudice standard is rarely applicable. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800–01, 49 L.Ed.2d 683 (1976). In only one case decided by the United States Supreme Court has the Court determined that prejudice must be presumed based upon pretrial publicity, *see Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and there are "only a few additional cases in which relief was granted on the basis of presumed prejudice." *Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir.1985).

In *Rideau*, a criminal defendant's videotaped confession of robbery, kidnapping, and murder was broadcast three times by a local television station. These broadcasts were seen by 24,000, 53,000, and 29,000 viewers, respectively, in a community of 150,000. We conclude that none of the pretrial publicity about Sonner's case[6] rises to the level of the publicity that was presumed prejudicial in *Rideau*. There is simply no basis in the record for impeaching the constitutional quality of Sonner's jury. Accordingly, this issue is without merit.

_____

[6] A number of newspaper articles detailed the financial impact of the case on Pershing County; the impact on the victim's family; posthumous honors awarded to the victim; facts adduced at the preliminary hearing, including details of the shooting, ensuing manhunt and arrest, as well as the statement: "When in custody, Sonner confessed to a Nevada Division of Investigation's officer that he had shot Borland;" "attempts" by defense counsel to make sanity an issue; the process and results of evaluations to determine whether Sonner was competent to stand trial; admissions by Sonner concerning other killings; details regarding the nature and extent of police investigation and evidence testing; photographs, including the crime scene, the victim's grieving parents and a memorial site at the location of the alleged shooting; the victim's funeral; Sonner's criminal history, including alleged prison escapes; evaluations of whether Sonner would be able to escape from Pershing County Jail; references to Sonner's efforts to obtain extraordinary relief and a stay in the trial; references to the start and continuation of efforts to select the jury; characterizations of Sonner as "judge, jury and executioner"; and several letters to the editor, one of which characterized Sonner as "the little maggot"; and numerous broadcasts in the electronic media.

11

1 *Sonner*, 930 P.2d at 712-13.

2 　　　When a trial court is "unable to seat an impartial jury because of prejudicial pretrial publicity

3 or an inflamed community atmosphere[,] . . . due process requires that the trial court grant defendant's

4 motion for a change of venue." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988) (citing *Rideau*

5 *v. Louisiana*, 373 U.S. 723, 726 (1963)). In *Skilling v. United States*, 561 U.S. 358 (2010), the U.S.

6 Supreme Court applied a two-pronged approach to determine whether the trial court erred by denying

7 a change of venue, considering, first, whether pretrial publicity and community hostility established a

8 presumption of juror prejudice, and then whether actual bias infected the jury. The Ninth Circuit has

9 explained the two types of prejudice as follows:

10　　　　　Interference with a defendant's fair-trial right "is presumed when the record
　　　　　demonstrates that the community where the trial was held was saturated with
11　　　　　prejudicial and inflammatory media publicity about the crime." Actual prejudice, on
　　　　　the other hand, exists when voir dire reveals that the jury pool harbors "actual partiality
12　　　　　or hostility [against the defendant] that [cannot] be laid aside."

13 *Hayes v. Ayers*, 632 F.3d 500, 508 (9th Cir. 2011) (quoted source omitted).

14 　　　As evidenced by the excerpt above, the Nevada Supreme Court employed the same two-

15 pronged approach in rejecting Sonner's claim. Sonner has not shown that the Nevada Supreme Court

16 was unreasonable in concluding that he had not demonstrated actual prejudice or presumed prejudice.

17 　　　With respect to actual prejudice, Sonner does not challenge the adequacy of the voir dire

18 process itself, which spanned several days and filled more than 1500 pages of reporter's transcripts.

19 *See Hayes v. Ayers*, 632 F.3d 500, 510-11 (9th Cir. 2011 (noting that the actual prejudice inquiry

20 focuses on the nature and extent of the voir dire examination and prospective jurors' responses to it).

21 As for the voir dire responses of the jurors who heard his case, Sonner points out that all the jurors

22 had read about the case in the newspaper (or had otherwise been exposed to it through various media)

23 and/or had discussed the case with others. ECF No. 180, p. 64-66. He also notes that many of them

24

25

26

1  were acquainted with witnesses, the trial judge, and/or the prosecuting attorneys.[3]  *Id.*  Without more,

2  this is not sufficient to show actual prejudice.  *See Ybarra v. McDaniel*, 656 F.3d 984, 992 (9th Cir.

3  2011) (holding that state supreme court reasonably determined, for the purposes of § 2254(d), that

4  jurors' exposure to news coverage or acquaintance with the victim or her family did not amount to

5  unconstitutional juror partiality); *see also Skilling*, 561 U.S. at 381 ("[J]uror impartiality, we have

6  reiterated, does not require ignorance.").

7       While Sonner does cite to selected voir dire comments that show potential prejudice, each of

8  the jurors seated in his case affirmed in open court, under oath, that he or she could set aside his or

9  her preexisting opinions about the facts and the law relevant to the case.  *Cf. Skilling*, 561 U.S. at 391-

10  99 (rejecting petitioner's claims of individual juror prejudice and noting the high deference a

11  reviewing court must pay to the trial court's findings of impartiality).  Moreover, Sonner did not

12  challenge any of the seated jurors for cause, which is "strong evidence" that he was satisfied they

13  "were not biased and had not formed any opinions as to his guilt."  *See id.* at 396 (quoting *Beck v.

14  Washington*, 369 U.S. 541, 557–558 (1962)).  In summary, the record amply supports the Nevada

15  Supreme Court's conclusion that Sonner cannot show actual prejudice.

16       Turning to the question of presumptive prejudice, *Hayes* is instructive here inasmuch as it

17  confirms how rarely presumptive prejudice serves as a basis for concluding that publicity about a

18  crime has deprived a defendant of his constitutional right to a fair trial.  *See Hayes*, 632 F.3d at 508

19  (citing Supreme Court and Ninth Circuit precedent that has held that presumptive prejudice is

20  reserved for "extreme" cases).  The court in *Hayes* pointed out that, of the three watershed cases

21  establishing the principle of presumptive prejudice – *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes

22  v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966) – only *Rideau* did not

23  "concern [an] instance[] where the media significantly interfered with the trial itself."  *See id.* (citing

24  _____

25  [3]  With respect to potential jurors who were dismissed, Sonner cites to only a smattering
    examples of alleged partiality or prejudice from several days of voir dire questioning.  ECF No. 180, p.
26  58 and 63.

13

footnote 14 in *Skilling*, where the Court distinguished *Estes* and *Sheppard* from *Rideau* because they "involved media interference with courtroom proceedings *during* trial" (*Skilling*, 561 U.S. at 382 n.14)). Because there is no evidence that the media significantly interfered with Sonner's trial, the Nevada Supreme Court reasonably applied *Rideau* as the controlling federal standard.

While the Nevada Supreme Court mentioned a few of the relevant facts in *Rideau*, the Court in *Skilling* described them in more detail:

> Wilbert Rideau robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them. Police interrogated Rideau in jail without counsel present and obtained his confession. Without informing Rideau, no less seeking his consent, the police filmed the interrogation. On three separate occasions shortly before the trial, a local television station broadcast the film to audiences ranging from 24,000 to 53,000 individuals. Rideau moved for a change of venue, arguing that he could not receive a fair trial in the parish where the crime occurred, which had a population of approximately 150,000 people. The trial court denied the motion, and a jury eventually convicted Rideau. The Supreme Court of Louisiana upheld the conviction.

*Skilling*, 561 U.S. at 379. Despite his claims to the contrary, Sonner's case bears little resemblance to *Rideau* beyond the fact that the crime and subsequent trial took place in a small community.

While Sonner cites to media coverage of alleged confessions, there is no evidence that the confessions were obtained involuntarily, that they were presented to the public as a filmed or videotaped interview of Sonner himself, or that they were pervasively broadcast on local television just prior to trial. Indeed, the record indicates that Sonner initiated at least some contact with news media. ECF No. 207-16, p. 7; ECF No. 208-13, p. 3. And, although the scenario in *Rideau* may not be the exclusive method for establishing presumptive prejudice, Sonner has not shown that the publicity in his case had even a remote possibility of causing the type of prejudice that presumptively arose as a result of the publicity in that case. *See Rideau*. 373 U.S. at 726 ("For anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense was Rideau's trial – at which he pleaded guilty to murder. Any subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality.").

14

1    Because the Nevada Supreme Court reasonably concluded that Sonner suffered no presumed

2 or actual prejudice compelling a change of venue, Claim H must be denied.[4]

3         **Claim I**

4         In Claim I, Sonner claims his constitutional rights were violated when the state trial judge

5 failed to recuse himself due to a conflict of interest arising from a prior attorney-client relationship

6 with the prosecutor in Sonner's case.  The alleged conflict consisted of the prosecutor, Brent Kolvet,

7 having represented the trial judge, Judge Richard Wagner, in a civil matter.  Just prior to trial,

8 Sonner's counsel filed a motion to disqualify Kolvet or, in the alternative, to recuse Judge Wagner on

9 the ground that Kolvet had an attorney-client relationship with Judge Wagner at the time Kolvet had

10 been appointed as a Special Deputy District Attorney to handle Sonner's prosecution.  ECF No. 205-

11 47.  Judge Wagner denied the motion, stating that the attorney-client relationship had effectively

12 ended in October of 1993, more than two months before Kolvet's appointment, and that he did not

13 entertain any actual or implied bias toward any party.  ECF No. 206, p. 6-8.

14        Sonner presented Claim I to the Nevada Supreme Court in his direct appeal.  ECF No. 211-16,

15 p. 30-50; ECF No. 211-17, p. 2.  The Nevada Supreme Court decided the claim as follows:

16            Sonner had the burden of presenting sufficient grounds for the judge's recusal;
         and this court has always accorded substantial weight to a judge's determination that
17       he can fairly and impartially preside over a case.  *See Goldman v. Bryan*, 104 Nev.
         644, 649, 764 P.2d 1296, 1299 (1988).  However, Sonner produced no evidence of any
18       improper motive or instances of actual bias on the part of the district judge.  Moreover,
         "an allegation of bias in favor or against an attorney for a litigant generally states an
19       insufficient ground for disqualification because 'it is not indicative of extrajudicial bias
         against a "party".'"  *In re Petition to Recall Dunleavy*, 104 Nev. 784, 790, 769 P.2d
20       1271, 1275 (1988) (quoting *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1398 (8th
         Cir. 1983)).

21
             Additionally, although Judge Wagner verbally terminated the attorney-client
22       relationship with Kolvet on January 5, 1994—the same day Kolvet was deputized as a

23 ───────────────────────

24         [4]  Claim H also includes an allegation that Sonner's "[t]rial counsel provided ineffective
   assistance under the Sixth, Eighth, and Fourteenth Amendments by failing to assure that the trial court
   changed the venue in his case."  ECF No. 96, p. 45.  Because Sonner has not established a reasonable
25 probability that additional efforts by counsel would have resulted in a change of venue, this claim fails
   under the *Strickland* standard discussed below.

26
                                                    15

1   deputy district attorney for Pershing County—the record reflects that the
    attorney-client relationship effectively concluded at least 62 days before the verbal
2   discharge on January 5th.  On October 29, 1993, Kolvet sent Judge Wagner a letter
    indicating that the Ninth Circuit had denied rehearing to the litigant who had prompted
3   Kolvet's representation of Judge Wagner.  This appears to be the last formal
    involvement that Kolvet had with Judge Wagner's case. For these reasons, we
4   conclude that the judge properly refused to recuse himself.

5   *Sonner*, 930 P.2d at 712.

6        The Due Process Clause "clearly requires a 'fair trial in a fair tribunal' before a judge with no

7   actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*,

8   520 U.S. 899, 904–05 (1997) (quoting *Withrow v. Larkin*, 421 U.S. 35, 46 (1975)).  "The Constitution

9   requires recusal where 'the probability of actual bias on the part of the judge or decisionmaker is too

10  high to be constitutionally tolerable.'" *Hurles v. Ryan*, 752 F.3d 768, 788 (9th Cir. 2014) (quoting

11  *Withrow*, 421 U.S. at 47).  Accordingly, a habeas petitioner need not prove actual bias to obtain relief,

12  but he must show an intolerable risk of bias.  *Hurles*, 752 F.3d at 789.

13       Here, Kolvet represented Judge Wagner in a civil matter wholly unrelated to Sonner's

14  prosecution.  While the civil matter was apparently resolved in Wagner's favor, there is no evidence

15  that Wagner was beholden to Kolvet or that the prior attorney-client relationship would color

16  Wagner's judgment in Sonner's case.  Simply put, Sonner falls well short of establishing that Judge

17  Wagner's refusal to recuse himself created an intolerable risk of bias.  *See Withrow*, 421 U.S. at 47

18  (noting that a petitioner must "overcome a presumption of honesty and integrity in those serving as

19  adjudicators").

20       Claim I is denied.

21                    **Claim GG**

22       In Claim GG, Sonner claims his constitutional rights were violated because the state trial court

23  improperly denied his motion for discovery of Trooper Borland's institutional records.  Prior to trial,

24  the defense filed a motion requesting discovery of all records pertaining to Trooper Borland on the

25  ground that Sonner was entitled to present all available mitigating evidence and evidence to counter

26

                                     16

"victim impact evidence" presented by the State.  ECF No. 204-20.  The trial court denied the motion, finding it "overly broad."  ECF No. 205-41.  Sonner contends he was entitled to the information under the authority of *Brady v. Maryland*, 373 U .S. 83 (1963) and under Nevada law.

Sonner presented Claim GG to the Nevada Supreme Court in his direct appeal.  ECF No. 211-17, p. 25-29.  The Nevada Supreme Court decided the claim as follows:

> Sonner contends that it was error to deny his motion to discover the victim's personnel records in order to rebut State evidence of Borland's value as a law enforcement officer and an individual.  Sonner's claim is allegedly supported by NRS 174.245,[8] Article 1 of the Nevada Constitution, the Sixth and Fourteenth Amendments to the Federal Constitution, and the *Brady* doctrine.  Sonner is wrong.
>
> Although the State may not withhold evidence favorable to the accused and material to either guilt or sentence, the State is under no obligation to accommodate a defendant's desire to flail about in a fishing expedition to try to find a basis for discrediting a victim.  *See State v. Blackwell*, 120 Wash.2d 822, 845 P.2d 1017, 1021 (1993) ("Defense counsel's broad, unsupported claim that the police officers' personnel files may lead to material information does not justify automatic disclosure of the documents.").  As the Washington Supreme Court observed: "A defendant must advance some factual predicate which makes it reasonably likely the requested file will bear information material to his or her defense.  A bare assertion that a document 'might' bear such fruit is insufficient."  *Id*. 845 P.2d at 1022; *see also People v. Gissendanner*, 48 N.Y.2d 543, 423 N.Y.S.2d 893, 897, 399 N.E.2d 924, 928 (1979) ("What [the decisions] do call for is the putting forth in good faith of some factual predicate which would make it reasonably likely that the file will bear such fruit and that the quest for its contents is not merely a desperate grabbing at a straw.").
>
> Sonner's request was based on nothing more than the assertion of a general right to search for whatever mitigating evidence might be found in Borland's records.  Sonner failed to put forth any theory of relevance beyond an unfocused general statement.  For example, if Sonner had presented a foundation for believing that Borland had a reputation for being an "aggressive" trooper who, consistent with his reputation, provoked Sonner's action, this might have been sufficient to warrant discovery of corroborating evidence in Borland's file. *See* Jeffrey F. Ghent, Annotation, *Accused's Right to Discovery or Inspection of Records of Prior Complaints Against, or Similar Personnel Records of, Peace Officer Involved in the Case*, 86 A.L.R.3d 1170, 1175 (1978).  However, the evidence supports no such theory as Borland had not even drawn his weapon when he was gunned down.  The district court did not abuse its discretion in denying Sonner's motion for discovery.

---

[8] NRS 174.245 provides:

> Upon motion of a defendant the court may order the district attorney to permit the defendant to inspect and copy or photograph books, papers, documents, tangible objects, buildings or places, or

17

copies or portions thereof, which are within the possession, custody or control of the state, upon a showing of materiality to the preparation of his defense and that the request is reasonable.

*Sonner*, 930 P.2d at 715-16.

In *Brady*, the Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment. *Brady*, 373 U.S. at 87. The Court has also clarified that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). In addition, *Brady* does not permit a defendant to sift through information held by the government to determine materiality. *Pennsylvania v. Ritchie*, 480 U.S. 39, 59–60 (1987).

Sonner has not identified any material evidence favorable to the defense that the State withheld from him. The Nevada Supreme Court's decision rejecting his *Brady* claim adheres closely to the clearly established federal law cited above. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (holding that state court is not required to cite U.S. Supreme Court cases, or even be aware of them, to avoid its decision being "contrary to" U.S. Supreme Court precedent). And, the decision was not based on an unreasonable determination of the facts.

Claim GG does not warrant habeas relief.

**Claim II**

In Claim II, Sonner claims his constitutional rights were violated because the trial court improperly limited his penalty phase presentation regarding the sentence of life without parole. Specifically, Sonner contends that the trial court erred by not allowing him to present the testimony of Billy Farmer to inform the jury as to the consequences of a sentence of life without possibility of parole. Farmer is a Nevada prisoner serving that particular sentence. According to Sonner, he was entitled to present such evidence because the Due Process Clause does not allow the execution of a person "on the basis of information which he had no opportunity to deny or explain" *(Gardner v.*

18

*Florida*, 430 U.S . 349, 362 (1977)) and the Eight Amendment imposes a heightened standard "for

reliability in the determination that death is appropriate punishment in a specific case" (*Woodson v.

North Carolina*, 428 U.S. 280, 305 (1977)).

Sonner presented Claim II to the Nevada Supreme Court in his direct appeal.  ECF No. 211-

17, p. 29-32.  The Nevada Supreme Court decided the claim as follows:

> Sonner demanded that the State produce a state-prison inmate, Billy Ray
> Farmer, to testify about the consequences of serving a life sentence without the
> possibility of parole.  The district court refused, concluding that the testimony of
> Farmer was irrelevant.  Sonner contends that this ruling violated his due process right
> to explain to the jury the true meaning of one of the punishments they were to
> consider, and violated his Eighth Amendment right to a jury capable of a reasoned
> moral judgment concerning its sentencing options, and whether death, rather than
> some lesser sentence, ought to be imposed.
>
> NRS 175.552(3) provides that, during the sentencing hearing, "evidence may
> be presented concerning aggravating and mitigating circumstances relative to the
> offense, defendant or victim and on any other matter which the court deems relevant to
> sentence, whether or not the evidence is ordinarily admissible."  We conclude that the
> evidence was irrelevant to the sentence.  Additionally, as the district court noted, both
> sides could probably empty the prison of various people doing life without the
> possibility of parole, and each one would have a different concept of what that means.
> This highly tenuous, unsupported, and irrelevant assignment of error is simply without
> merit.

*Sonner*, 930 P.2d at 716 (footnote omitted).

"[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment . .

. requires consideration of the character and record of the individual offender and the circumstances

of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty

of death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), (ellipses in original) (quoting *Woodson*, 428

U.S. at 304.  Accordingly, the Supreme Court has held since 1978 that a defendant facing a capital

sentence must have the opportunity to present all relevant evidence in mitigation.  *See id.* at 604–05.

The test for relevance with respect to mitigating evidence "is simply whether the evidence is of such a

character that it might serve as a basis for a sentence less than death."  *Tennard v. Dretke*, 542 U.S.

274, 285 (2004) (internal quotation marks omitted).  In the context of the Supreme Court's

mitigation-evidence case law, however, the evidence still must be relevant to "a reasoned moral response to the defendant's background, character, and crime." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (quoted source omitted).

According to Sonner, Farmer would have testified about the conditions of confinement in Nevada prisons and the fact that a prisoner has virtually no chance of ever escaping from a maximum security facility. Such testimony did not bear upon Sonner's background or character or upon the circumstances of Sonner's crime. *See Lockett*, 438 U.S. at 604 ("Nothing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense."). No U.S. Supreme Court case holds that a capital defendant's constitutional rights are violated by the trial court's refusal to allow evidence that does not fall into one of these categories. Consequently, this court must defer to the Nevada Supreme Court's rejection of Claim II. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court regarding the [issue presented] here, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.").

Claim II is denied.

**Claim PP(4)**

In Claim PP(4), Sonner claims his constitutional rights were violated because a jury instruction issued in the penalty phase of his trial introduced improper considerations into the sentencing process and had the potential to confuse the jury into believing that even if they sentenced him to life without the possibility of parole, he might still be paroled. The instruction, which was prescribed by the Nevada Supreme Court in *Petrocelli v. State*, 692 P.2d 503 (Nev. 1985), read as follows:

> Life Imprisonment with the possibility of parole is a sentence to life imprisonment which provides that the defendant would be eligible for parole after a period of 10 years. This does not mean that he would be paroled after ten years but only that he would be eligible after that period of time.

1          Life imprisonment without the possibility of parole means exactly what it says,
       that the defendant shall not be eligible for parole.
2
           If you sentence the defendant to death you must assume that the sentence will
3      be carried out.

4          Although under certain circumstances and conditions the State Board of
       Pardons Commissioners has the power to modify sentences, you are instructed that you
5      may not speculate as to whether the sentence you impose may or may not be changed
       at a later date.
6

7   ECF No. 210-4, p. 27.

8          Sonner presented Claim PP(4) to the Nevada Supreme Court in his direct appeal. ECF No.

9   211-16, p. 18-29. The Nevada Supreme Court decided the claim as follows:

10         Sonner contends that the district court erred in instructing the jury that under
       certain circumstances and conditions the State Board of Pardons Commissioners has
11     the power to modify sentences. Sonner argues that, in his case, the instruction violated
       his constitutional rights to due process and a reliable sentence because it misled the
12     jury into believing that parole was a future possibility even if it sentenced him to life
       without possibility of parole. We disagree.
13
           The instruction given in this case is consistent with the dictates of NRS
14     175.161(7) and, as previously held by this court, is constitutional under both the state
       and federal constitutions because it does not mislead the jury. *See Petrocelli v. State*,
15     101 Nev. 46, 54–56, 692 P.2d 503, 510–11 (1985). The instruction given in this case
       is identical to the one set forth by this court in *Petrocelli*. At the time Sonner was
16     sentenced, the instruction was an accurate statement of the law. Moreover, as we
       observed in *Petrocelli*, the United States Supreme Court has held that such an
17     instruction "does not run afoul of constraints against arbitrary and capricious
       sentencing patterns, and that the possibility of commutation is not too speculative of
18     [sic] an element for the jury's consideration." *Id*. at 55, 692 P.2d at 510 (citing
       *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)). Sonner
19     was not prejudiced by the instruction.

20  *Sonner*, 930 P.2d at 711 (footnotes omitted).

21         In *Ramos*, the Court held that instructions to a capital sentencing jury may include accurate

22  information regarding the Governor's authority to commute a sentence of life without possibility of

23  parole to a sentence that would include the possibility of parole. 463 U.S. at 1001. Sonner contends

24  that the instruction was not "accurate" because, even if the Board of Pardons Commissioners

25  commuted Sonner's sentence, he would not have been eligible for parole under Nevada law. In this

26
                                          21

1  regard, he notes that the fact that he was wanted for crimes in other jurisdictions, that he had a lengthy

2  criminal history, and that he had documented substance abuse issues made him ineligible for parole

3  under Nev. Rev. Stat. § 213.1099(4).[5]

4       This court does not agree.  The "board" referenced in § 213.1099 is the State Board of *Parole*

5  Commissioners.  Irrespective of whether that board was permitted to grant Sonner parole given his

6  particular circumstances, the State Board of *Pardons* Commissioners was permitted, under Nevada

7  law at the time, to modify Sonner's sentence.  *See Sonner*, 930 P.2d at 711.  The instruction did not

8  erroneously suggest to the jury that sentencing Sonner to death was the only way to prevent him from

9  someday being released into society.  Indeed, the instruction did not refer to a particular sentence with

10  respect to the Board of Pardons Commissioner's power to modify sentences.  *Cf. Coleman v.*

11  *Calderon*, 210 F.3d 1047, 1050 (9th Cir. 2000) (finding instruction constitutionally infirm because it

12  plainly misled jury as to the Governor's power "to commute a sentence from life imprisonment

13  without the possibility of parole to some lesser sentence that would include the possibility of parole").

14       Sonner also argues that he is entitled relief under *Simmons v. South Carolina*, 512 U.S. 154

15  (1994), which held that inaccurate instructions about parole eligibility may deprive a defendant of due

16  _____

17      [5]  Nev. Rev. Stat. § 213.1099(4) provides:

18         Except as otherwise provided in NRS 213.1215, the Board may not release on
parole a prisoner whose sentence to death or to life without possibility of parole has been
commuted to a lesser penalty unless the Board finds that the prisoner has served at least

19  20 consecutive years in the state prison, is not under an order to be detained to answer
for a crime or violation of parole or probation in another jurisdiction, and does not have

20  a history of:

21  (a) Recent misconduct in the institution, and has been recommended for parole by the
Director of the Department of Corrections;

22  (b) Repetitive criminal conduct;

23  (c) Criminal conduct related to the use of alcohol or drugs;

24  (d) Repetitive sexual deviance, violence or aggression; or

25  (e) Failure in parole, probation, work release or similar programs.

26

process when the defendant's future dangerousness is at issue. *Simmons*, 512 U.S. at 163-66.  In *Simmons*, the trial court refused petitioner's request for the court to instruct his capital sentencing jury that a sentence of life imprisonment carried with it no possibility of parole. *Id*. at 160.  During the sentencing phase "[t]he State raised the specter of the petitioner's future dangerousness," but "[t]he jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested." *Simmons*, 512 U.S. at 165-66.

     *Simmons* does not provide Sonner with grounds for relief as it is distinguishable on important points.  In *Simmons*, the petitioner's murder conviction exposed him to two possible sentences – death or life imprisonment – with eligibility for parole a conclusive impossibility under state law. *Id*. at 158.  The petitioner asked the trial court three times to inform the jury that in fact he was ineligible for parole under state law, but his requests were denied. *Id*. at 162.  Then, during deliberations, the jury sent a note to the judge specifically asking whether the imposition of a life sentence carried with it the possibility of parole. *Id* at 160.  Instead of providing the jury with the simple and accurate response – i.e., "no," the judge instructed the jury to a "not consider parole or parole eligibility" in reaching its verdict. *Id*.

     By contrast, the sentencing options in Sonner's case included life with the possibility of parole.  Sonner asked the trial court to replace the last sentence of  the *Petrocelli* instruction with the following sentence: "The State Board of Pardons Commissioners cannot change the sentence of life imprisonment without the possibility of parole."  ECF No. 210-10, p. 11.  For the reason noted above, such an instruction would not have been accurate.  And, unlike in *Simmons*, there is no evidence that Sonner's jury misunderstood its instructions, much less have its misunderstanding of its instructions exacerbated by a "confusing and frustrating" response to its attempt to clarify them. *Simmons*, 512 U.S. at 170.

     In summary, the Nevada Supreme Court's application of clearly established federal law was

1  not so unreasonable that fairminded jurists could not at least disagree on the correctness of the court's

2  decision.  Thus, this court must defer the state court's rejection of Claim PP(4).  *See Richter*, 562 U.S.

3  at 101.

4          Claim PP(4) is denied.

5          **Claim TT(2)**

6          In Claim TT(2), Sonner alleges that he was deprived of effective assistance of counsel, in

7  violation of his constitutional rights, because his trial counsel failed to seek a continuance of his

8  penalty phase trial so that he could first be sentenced on his non-murder convictions.  As noted above,

9  the jury also found Sonner guilty of being an ex-felon in possession of a firearm, possession of a

10  stolen vehicle, and resisting a public officer.  Subsequent to the penalty phase hearing, the trial court

11  sentenced him on those convictions and, with respect to the possession of stolen vehicle charge,

12  adjudicated him a habitual criminal, for which the court sentenced him to life imprisonment without

13  the possibility of parole.  ECF Nos. 211-5; ECF No. 211-8.  Sonner contends that, had counsel

14  obtained a continuance, counsel could have argued as mitigation that he would be incarcerated for a

15  term of life without the possibility of parole if the jury decided not to impose the death penalty.

16          In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two-

17  prong test for analysis of claims of ineffective assistance of counsel (IAC):  a petitioner claiming

18  ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell

19  below an objective standard of reasonableness," and (2) that the attorney's deficient performance

20  prejudiced the defendant such that "there is a reasonable probability that, but for counsel's

21  unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at

22  688, 694.

23          Sonner presented Claim TT(2) to the Nevada Supreme Court in his appeal of state district

24  court's denial of his first state post-conviction petition. ECF No. 213-10, p. 28-30.  The Nevada

25  Supreme Court correctly identified and applied *Strickland* as the federal law standard governing

26

24

Sonner's IAC claims.  ECF No. 213-14, p. 2-3.  The Nevada Supreme Court addressed the claim as follows:

> Sonner claims that trial counsel were ineffective because after he was found guilty they failed to ask for a continuance of the penalty phase so that the district court could first sentence him on the noncapital offenses.  He reasons that then his counsel could have argued to the jury that consecutive life sentences for the murder would be sufficient punishment when combined with the term of life in prison without possibility of parole which he received for being a habitual criminal.
>
> Sonner's evidence did not establish proof of an objective standard of reasonableness requiring counsel to seek to continue a penalty phase in this manner.  Nor does he cite specific legal authority for deeming counsel deficient for failing to seek such a continuance.  Such a novel proposition, therefore, deserves little consideration by this court. *Cf. Maresca v. State*, 103 Nev. 669, 673, 748 P.2d 3, 6 (1987).
>
> Even assuming that counsel should have requested a continuance, their failure to do so did not prejudice Sonner for at least two reasons.  First, the district court made clear that there is no reasonable probability that it would have granted such a request.  Second, even if Sonner had received the other sentences first, we discern no reasonable probability that that information would have changed the jury's verdict.  Jurors had the option of giving him two consecutive terms of life in prison without possibility of parole for the murder and weapon enhancement, but chose to give him death.  Given the numerous aggravating circumstances of this murder, Sonner's heinous criminal history, and his own request for death, it is unlikely that jurors would have decided that Sonner did not deserve death simply because he might receive three consecutive life terms.  Trial counsel were not ineffective in this respect.

*Id*. at 3-4.

Sonner cannot show that the Nevada Supreme Court's application of the *Strickland* standard was unreasonable.  He does not cite to any controlling legal authority or persuasive arguments that would have supported a request from Sonner's counsel to continue the penalty hearing.  Counsel did not perform below constitutional standards by not making a request devoid of supporting legal or factual grounds.

In Sonner's state post-conviction proceeding, the state district court astutely pointed out that, had it been informed that Sonner had already been sentenced to life without possibility of parole, the jury would have likely (1) disregarded life *with* the possibility of parole as a possible sentence for the murder and (2) felt more compelled to impose a death sentence given the seriousness of first degree

murder relative to possession of a stolen vehicle and being a habitual criminal.[6]  ECF No. 213, p. 31-32.  The state district court also noted that delaying the penalty phase would have increased the possibility of jury contamination.  *Id.*

Neither prong of the *Strickland* standard is satisfied with respect to Claim TT(2).  Thus, the claim is denied.

### Claims TT(10) and TT(11)

In Claim TT(10), Sonner alleges that he was deprived of effective assistance of counsel, in violation of his constitutional rights, because his trial counsel failed to call Dr. Carlos Brandenburg to testify in mitigation in the penalty phase of his trial.  Dr. Brandenburg, a psychologist, assessed Sonner's competency prior to trial during a one-month stay at maximum security mental health facility.  In his testimony at a pre-trial competency hearing, Dr. Brandenburg characterized Sonner as a "model inmate" and confirmed that he did not attempt to escape from the facility or act in an assaultive manner towards any person at the facility.  ECF No. 202-13, p. 30-31.  According to Sonner, effective counsel would have presented Dr. Brandenburg's testimony in mitigation and to rebut the prosecution's evidence that Sonner would be a future danger and an escape risk.

In Claim TT(11), Sonner alleges that he was deprived of effective assistance of counsel because his trial counsel failed to call, during the penalty phase, an expert witness on institutional adjustment.  According to Sonner, an institutional adjustment expert could have provided testimony about the conditions of confinement for a prisoner sentenced to life imprisonment without possibility of parole in a maximum security prison, which would have demonstrated for the jury that Sonner would not pose a security risk or a future danger.  Here again, Sonner contends that effective counsel would have presented such testimony as evidence in mitigation and in rebuttal of the aggravating evidence presented by the State.

In his state post-conviction appeal, Sonner presented Claims TT(10) and TT(11) as a unified

---

[6]  The jury would have also been notified that Sonner was a habitual criminal.

1 claim. ECF No. 213-10, p. 30-32. The Nevada Supreme Court addressed the claim(s) as follows:

2          Sonner also claims that his trial counsel were ineffective because they failed to
        present evidence at the penalty phase that he had adjusted well to his incarceration.
3        Sonner asserts that this evidence could have been provided by a Lakes Crossing Center
        psychologist who testified at a pretrial competency hearing that Sonner was well
4        behaved at the center and never attempted to escape. Sonner asserts that personnel at
        the Pershing County Jail could have provided similar evidence. Sonner apparently
5        presented no evidence at the evidentiary hearing from the psychologist or any jail
        personnel, so Sonner made no showing of what kind of evidence could have been
6        presented at his trial on this matter.

7          Even assuming that trial counsel could have and should have presented
        evidence that Sonner was adjusting to incarceration and had not attempted to escape,
8        Sonner was not prejudiced. The mitigating effect of such evidence would have been
        slight, at best, and there is no reasonable probability that it would have made any
9        difference in the face of the State's case, particularly the evidence that Sonner had
        been incarcerated before for violent crime, had twice escaped, and had consequently
10       committed further violent crimes, including robbery, rape, and a double murder.
        Sonner's trial counsel were not ineffective in this regard.

11

12 ECF No. 213-14, p. 4-5.

13          Here again, Sonner cannot show that the Nevada Supreme Court's application of the

14 *Strickland* standard was unreasonable. There is no question that testimony about Sonner's behavior

15 during a relatively brief stay at the mental health facility and his pre-trial incarceration in Pershing

16 County would have been far outweighed by his prior record of escapes and violent crime. With

17 respect to presenting an expert witness on institutional adjustment, Sonner has presented no evidence

18 setting forth the testimony such an expert would have provided or demonstrating that it actually

19 would have supported his case for mitigation. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir.

20 2001) (no ineffective assistance of counsel for failing to retain expert where petitioner did not offer

21 evidence that expert would have testified). In addition, any speculation as to what an expert would

22 have said is not sufficient to show prejudice. *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir.

23 1997) ("Speculation about what an expert could have said is not enough to establish prejudice.").

24          Neither prong of the *Strickland* standard is satisfied with respect to Claim TT(10) or TT(11).

25 Thus, the claims are denied.

26

**Claims XX and HHH**

In Claim XX, Sonner claims that the Nevada death penalty statute violates the U.S. Constitution. He contends this is so because:

      1. The Nevada death penalty statutes lack adequate standards for evaluating the appropriate sentence.

      2. The Nevada death penalty statutes lack safeguards to ensure that the sentenced focuses on permissible sentencing considerations.

      3. The Nevada death penalty statutes lack a mechanism to ensure the reliability of death sentences.

      4. The Nevada death penalty statutes fail because the aggravating factors are vague and overlapping.

      5. The Nevada death penalty statutes fail because they use overbroad and vague language to describe the aggravating factors.

      6. NRS § 200.033(8) unconstitutionally permits "depravity of mind" to be an aggravating factor.

      7. NRS 175.552 unconstitutionally permits the introduction of hearsay to prove "other matter evidence."

      8. Nevada unconstitutionally did not require the jury to unanimously agree on the aggravating factors that have been proven, and that death is the appropriate sentence.

      9. The Nevada death penalty statutes are unconstitutional because they fail to require jurors to make written findings as to all reasons for the sentence imposed.

      10. The Nevada Supreme Court unconstitutionally fails to conduct inter and intracase proportionality review.

In Claim HHH, Sonner alleges that Nevada's aggravating circumstances, taken together, encompass nearly all first degree murders. The thrust of Claims XX and HHH is that the Nevada's capital sentencing scheme allows for the arbitrary imposition of the death penalty because it fails to narrow the class of persons eligible for the death penalty.

Since *Furman v. Georgia*, 408 U.S. 238 (1972), the United States Supreme Court has required that there be a "meaningful basis for distinguishing the few cases in which [the death sentence] is

28

imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. at 313 (WHITE, J. concurring). A capital sentencing scheme must "genuinely narrow the class of persons eligible and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). The finding of an aggravating circumstance that serves the "'function of narrowing the class of persons convicted of murder who are eligible for the death penalty'" is "all that the Constitution requires." *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (citing *Zant*, 462 U.S. at 874).

The Nevada statutes contain a list of aggravating circumstances that elevate a first degree murder to a capital crime, at least one of which the jury must find beyond a reasonable doubt for the defendant to be sentenced to death. Nev. Rev. Stat. §§ 175.554(4) and 200.033.[7] The statutes further provide that a defendant is eligible for the death penalty only if one or more aggravating circumstances are found and any mitigating circumstance or circumstances which are found do not outweigh the aggravating circumstance or circumstances. Nev. Rev. Stat. §§ 175.554(2) and 200.030(4)(a). This is sufficient to satisfy the constitutional requirements described above.

Sonner's challenge regarding Nevada's aggravating circumstances also fails. An aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. *See Arave v. Creech*, 507 U.S. 463, 474 (1993). ("If the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm"). Second, the aggravating circumstance may not be unconstitutionally vague. *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

In *Godfrey*, the Supreme Court considered an aggravating circumstance instruction that allowed for the death penalty if the jury found that the murder was "'outrageously or wantonly vile,

---

[7] The statutes governing Nevada's capital sentencing have been amended since 1993, but unless otherwise noted, the provisions discussed herein applied then, as they do now.

29

horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.'" 446 U.S. at 422 (quoting Georgia statute). The Court held that the instruction was unconstitutional as applied in that case because it resulted in "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury." *Id.* at 429. The Court further held that the Georgia Supreme Court failed to cure the defect because it did not apply a constitutional construction of the statutory language in affirming petitioner's death sentences on appeal. *Id.* at 432-33.

As explained in *Tuilaepa v. California*, the Supreme Court has found very few death sentence eligibility or selection factors to be impermissibly vague and all of those have been similar to each other. 512 U.S. 967, 973-74 (1994) (citing to *Godfrey* and *Maynard v. Cartwright*, 486 U.S. 356, 361-364 (1988) as examples, the latter of which addressed an aggravating circumstance that asked whether the murder was "especially heinous, atrocious, or cruel").[8] An aggravating factor withstands a constitutional challenge if it has some "common sense core of meaning . . . that criminal juries should be capable of understanding." *Id.* at 973 (quoting *Jurek v. Texas*, 428 U.S. 262, 279 (1976) (White, J., concurring in judgment)).

In Claim XX, Sonner identifies only two aggravating circumstances as being vague or overly broad.[9] However, neither of those circumstances was alleged by the State in his case and, therefore,

---

[8] Though *Tuilaeapa* was decided over 20 years ago, this state of affairs still applies today. In the rare instances since *Tuilaeapa* where the Court has found a capital sentencing factor invalid on vagueness grounds, the factor has consisted of pejorative adjectives that generally apply to all murders. *See, e.g.*, *Barber v. Tennessee*, 513 U.S. 1184 (1995) (mem.) (denying certiorari on other grounds, but noting "wicked or morally corrupt" as an aggravating circumstance is "plainly impermissible" because such a state of mind is characteristic of every murder).

[9] One, that "[t]he murder involved torture, depravity of mind or the mutilation of the victim," was held unconstitutional in *Deutscher v. Whitley*, 884 F.2d 1152, 1162 (9th Cir. 1989), and was subsequently amended to remove the depravity of mind component. Nev. Rev. Stat. § 200.033(8). The constitutionality of the other, that "[t]he murder was committed upon one or more persons at random and without apparent motive," has been raised in at least one reported Ninth Circuit case, but the court of appeals declined to address the issue. *See Moran v. McDaniel*, 80 F.3d 1261, 1273 (9th Cir. 1996).

cannot provide a ground for relief here.[10]  In Claim HHH, he lists all nine of the aggravating

circumstances in effect at the relevant time and explains how each one can be interpreted broadly to

include a large class of first degree murderers.  The four that are pertinent to his case, however, all

pass constitutional muster.  *See Roberts v. Louisiana*, 431 U.S. 633, 636 (1977) (peace officer killed

while engaged in the performance of his official duty); *Davis v. Executive Director of Dept. of

Corrections*, 100 F.3d 750, 769 (10th Cir. 1996) (avoiding or preventing lawful arrest); *Hill v.

Lockhart*, 927 F.2d 340, 343–44 (8th Cir. 1991) (prior violent felony); *Gray v. Lucas*, 677 F.2d 1086,

1109 (5th Cir. 1982) (murder by a person under sentence of imprisonment).

Sonner also challenges what he refers to as a "catch all" aggravating circumstance, but there is

no such thing under Nevada law.  While the State may present, at the penalty hearing, "any other

matter which the court deems relevant to the sentence" (Nev. Rev. Stat. Ann. § 175.552(3)) that does

not mean, as Sonner appears to be claiming, that such evidence can be used to establish an

aggravating circumstance other than one specifically enumerated under Nev. Rev. Stat. § 200.033.

Claims XX and HHH are denied.

**Claim YY**

In Claim YY, Sonner alleges that Nevada's death penalty scheme violates U.S. Supreme Court

precedent established in *Jones v. United States*, 526 U. S. 227 (1999); *Apprendi v. New Jersey*, 530

U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002); and *Blakely v. Washington*, 542 US 296

(2004).  Under these cases, any fact that exposes a defendant to a punishment greater than that

authorized by the jury's guilty verdict must be submitted to a jury and proved beyond a reasonable

doubt.  *See Blakely*, 542 U.S. at 301 (explaining the holding in *Apprendi*).  According to Sonner, this

means that, in Nevada, a jury must unanimously find beyond a reasonable doubt that aggravating

circumstances exist and that the aggravating circumstances substantially outweigh the mitigating

---

[10]  Sonner does not cite, nor can this court locate, any case law that authorizes a federal court to
grant habeas relief based on an infirm aggravating circumstance that was not alleged or found in the
petitioner's state criminal proceeding.

circumstances. He argues that the death penalty scheme under which he was sentenced was unconstitutional because the jury was not required to unanimously find the existence of aggravating circumstances, and was not required to unanimously find that aggravating circumstances substantially outweigh mitigating circumstances beyond a reasonable doubt.

As an initial matter, the parties dispute whether Nevada law at the time required the jury to agree unanimously with respect to the existence of an aggravating circumstance. This court need not resolve this issue here because the jury in Sonner's case was explicitly instructed that "[t]he jury may impose a sentence of death only if it unanimously finds at least one aggravating circumstance has been established beyond a reasonable doubt" and that "[t]he jury must be unanimous in order to find the existence of any aggravating circumstance or circumstances." ECF No. 210-4, p. 23.

With respect to the other eligibility factor, this court first notes that Sonner misstates the requirement inasmuch as the phrase "substantially outweigh" does not appear anywhere in Nevada's death penalty statutes, nor has the U.S. Supreme Court imposed such a standard. As noted above, a defendant is eligible for the death penalty in Nevada as long as the factfinder finds (in addition to the existence of an aggravating circumstance) that mitigating circumstances do not outweigh the aggravating circumstance or circumstances. And, despite Sonner's construction of the cases to the contrary, none of the U.S. Supreme Court cases he cites support his contention that the weighing determination is a "fact" that must be submitted to a jury or found beyond a reasonable doubt.

The holding in *Ring* is "tightly delineated" to deciding whether the Sixth Amendment required jury findings on the existence of aggravating circumstances. *Ring*, 536 U.S. at 597 n.4. The Court concluded that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury." *Id*. at 609 (quoting *Apprendi*, 530 U.S. at 494 n.19. To be sure, as the "functional equivalent of an element," the existence of aggravating circumstances must be proved beyond a reasonable doubt (which Nevada law requires and required in Sonner's case). *See Alleyne v. United States*, 133 S.Ct.

32

2151, 2156 (noting that the Sixth Amendment right to a jury "in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt"). However, nothing in *Ring* can be read to extend either the right to a jury or the beyond a reasonable doubt standard to Nevada's weighing determination.

And, in a more recent case, the Supreme Court passed up the opportunity to hold that a jury must perform the weighing function. In *Hurst v. Florida*, 136 S.Ct. 616 (2016), the Court addressed the constitutionality of Florida's death penalty sentencing scheme, under which the jury rendered an advisory verdict, but the judge made the ultimate sentencing determinations, including a finding whether there "are insufficient mitigating circumstances to outweigh the aggravating circumstances." *Hurst*, 136 S. Ct. at 622. Rather than including the weighing function as an "element" that must be submitted to the jury and proved beyond a reasonable doubt, the Court confined its holding in this regard to the finding of an aggravating circumstance. *See id.* at 624 (holding that prior decisions upholding Florida's capital sentencing statute "are overruled to the extent they allow a sentencing judge to find an aggravating circumstance" and that Florida's sentencing scheme is unconstitutional because it "required the judge alone to find the existence of an aggravating circumstance").

Because the jury in Sonner's case was properly instructed that it must unanimously find existence of an aggravating circumstance beyond a reasonable doubt, he cannot establish a violation under the *Jones*/*Apprendi*/*Ring*/*Blakely* line of cases. Claim YY is denied.

### Claims ZZ AND GGG

In Claim ZZ, Sonner alleges that Nevada's death penalty scheme violates the U.S. Constitution because it allows the State to present evidence in the penalty phase of the trial beyond that which is needed to prove the existence of statutory aggravating circumstances. According to Sonner, the introduction of evidence other than that which is relevant to enumerated aggravating circumstances allows the jury to consider aggravating factors that are unconstitutionally vague under *Stringer v. Black*, 503 U.S. 222 (1992). In *Stringer*, the Court noted that "[a] vague aggravating

33

factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion" and that "[a] vague aggravating factor used in the weighing process . . . creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance." *Stringer*, 503 U.S. at 235.

Sonner makes a similar, if not identical, claim under Claim GG. In Claim GG, he argues that Nevada's death penalty statute is unconstitutional because it allows for the use of unspecified non-statutory aggravating circumstances. Both Claim GG and ZZZ are premised on Nev. Rev. Stat. § 175.552 which allows "any other matter which the court deems relevant to sentence" to be admitted during the penalty hearing.

Sonner presented Claims ZZ and GGG to the Nevada Supreme Court in his direct appeal. ECF No. 211-17, p. 45-48. The Nevada Supreme Court decided the claims as follows:

> Sonner contends that the use of unspecified, nonstatutory aggravating circumstances without instructing the jury as to what is or is not an appropriate aggravating circumstance, renders Nevada's death penalty statute unconstitutionally vague, fails to channel the jury's discretion, and results in cruel and unusual punishment. We disagree.
>
> Under NRS 175.552, evidence may be presented on "any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible." This court has held that NRS 175.552 "is not limited to those nine aggravating circumstances outlined in NRS 200.033." *Allen v. State*, 99 Nev. 485, 488, 665 P.2d 238, 240 (1983). Additionally, in *Gallego* we held that "[w]hether such additional evidence will be admitted is a determination reposited in the sound discretion of the trial judge." 101 Nev. at 791, 711 P.2d at 863. More importantly, however, as noted in *Gallego*, it is only after a jury has found the existence of statutorily defined aggravating circumstances beyond a reasonable doubt, that a jury may hear and consider other aggravating (and mitigating) evidence that is "relevant to the life of a defendant as a whole person." *Id*. at 791, 711 P.2d at 862. Based on these prior decisions, we conclude that it was not improper for the district court to allow the jury to consider evidence outside the categories listed in NRS 200.033.

*Sonner*, 930 P.2d at 718.

The jury in Sonner's case was instructed that evidence "not offered to prove an aggravating circumstance" was "not be considered as an aggravating circumstance." ECF No. 210-4, p. 16.

34

*Stringer* and the the other case Sonner cites in Claim ZZ – *Maynard v. Cartwright*, 486 U.S. 356
(1988) – each involved a particular aggravating factor found unconstitutionally vague because it failed
to give sufficient guidance to the jury in deciding whether to impose the death penalty. *Stringer*, 503
U.S. at 228-29; *Maynard*, 486 U.S. at 364. No U.S. Supreme Court case holds that a capital
defendant's constitutional rights are violated by failing to restrict penalty phase evidence to that which
supports a specified aggravating circumstance. Consequently, this court must defer to the Nevada
Supreme Court's rejection of Claims ZZ and GGG. *See Musladin*, 549 U.S. at 77. Claims ZZ and
GGG are denied.

**Claim III**

In Claim III, Sonner claims that his death sentence is unconstitutional because Nevada's
capital punishment system operates in an arbitrary and capricious manner. In support of this claim, he
alleges that, in Nevada, the death penalty is available for all first degree murders and that first degree
murders are not restricted to those cases traditionally defined as first degree murders. In addition, he
alleges that the death penalty is imposed disproportionately on racial minorities, that the lack of
resources provided to capital defendants virtually ensures that compelling mitigating evidence will
not be presented to the sentencing body, and that defects in the system are exacerbated by an
inadequate judicial review process.

Sonner's allegations as to the scope of the murders to which it may apply are addressed in the
court's discussion of Claims XX and HHH, above. Sonner's complaint regarding the racially-
disproportionate application of the death penalty also fails to provide grounds for habeas relief
because he has not shown that racial bias was a factor in *his* case. *See McCleskey v. Kemp*, 481 U.S.
279, 292-93 (1987) ("[T]o prevail under the Equal Protection Clause, McCleskey must prove that the
decisionmakers in *his* case acted with discriminatory purpose."). Similarly, Sonner has not shown
that lack of resources prevented him from presenting compelling evidence in his particular case.

The Constitution does require some form of meaningful review of death sentences to guard

1　against arbitrary and inconsistent results.  *See Jurek*, 428 U.S. at 276; *Proffitt v. Florida*, 428 U.S.

2　242, 258–60 (1976).  However, Sonner does not identify the manner in which Nevada's judicial

3　review process is inadequate.  Moreover, the Nevada Supreme Court conducted an adequate

4　Constitutional review of his death sentence.  Thus, this court also rejects this aspect of Claim III.

5　　　　　Claim III is denied.

6　　　　　**Claim JJJ**

7　　　　　In Claim JJJ, Sonner alleges that his death sentence is unconstitutional because the Nevada

8　death penalty scheme allows county prosecutors unlimited discretion in seeking the death penalty.  He

9　argues that disparity between Nevada's counties with respect to seeking and imposing the death

10　penalty and the failure of the Nevada Attorney General to implement a uniform policy violate his

11　right to equal protection under the Fourteenth Amendment.  Sonner cites the U.S. Supreme Court's

12　opinion in *Bush v. Gore*, 531 U.S. 98 (2000), as support for this claim.

13　　　　　Certainly, a prosecutorial decision may not be "'deliberately based upon an unjustifiable

14　standard such as race, religion, or other arbitrary classification.'"  *Bordenkircher v. Hayes*, 434 U.S.

15　357, 364 (1978) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962).  Also prohibited are vindictive

16　prosecutions in response to a defendant's exercise of protected statutory and constitutional rights.

17　*United States v. Goodwin*, 457 U.S. 368, 372 (1982).  Beyond that, the Constitution places virtually

18　no limits on prosecutorial discretion.  *See Bordenkircher*, 434 U.S. at 364 ("[S]o long as the

19　prosecutor has probable cause to believe that the accused committed an offense defined by statute, the

20　decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally

21　rests entirely in his discretion.").  Moreover, "the decision to prosecute is particularly ill-suited to

22　judicial review" and "[j]udicial supervision in this area . . . entails systemic costs of particular

23　concern."  *Wayte v. United States*, 470 U.S. 598, 607 (1985),

24　　　　　Sonner's has alleged no facts showing he was the victim of selective or retaliatory

25　prosecution.  Also, the holding in *Bush v. Gore* does not apply in the criminal procedure context.

26

1 *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006); *Little v. Crawford*, 449 F.3d 1075, 1082

2 n.5 (9th Cir. 2006). Accordingly, he has not established a violation of his federal constitutional rights

3 that would provide grounds for habeas corpus relief.

4       Claim JJJ is denied.

5           **Claim KKK**

6       In Claim KKK, Sonner claims that the death penalty is, per se, cruel and unusual punishment

7 and therefore prohibited by the Eight Amendment. This claim is unsupportable under controlling

8 Supreme Court precedent and must be denied. *See Gregg v. Georgia*, 428 U.S. 153, 187 (1976).

9       Claim KKK is denied.

10       IV. CONCLUSION

11       For the reasons set forth above, Sonner is not entitled to habeas relief.

12                *Certificate of Appealability*

13       Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing Section

14 2254 Cases requires this court to issue or deny a certificate of appealability (COA). Accordingly, the

15 court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA.

16 *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

17       Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

18 substantial showing of the denial of a constitutional right." With respect to claims rejected on the

19 merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment

20 of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing

21 *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if

22 reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a

23 constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

24       The COA standard is not high. Sonner must only "'sho[w] that reasonable jurists could

25 debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to

26

proceed further.'" *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations omitted). Having reviewed its determinations and rulings in adjudicating Sonner's petition, the court finds that the *Slack* standard is met with respect to the court's denial of Claim PP(4), above. The court therefore grants a certificate of appealability as to that issue. The court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Sonner's other habeas claims.

**IT IS THEREFORE ORDERED** that petitioner's amended petition for writ of habeas corpus (ECF No. 96) is DENIED. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is issued as to the court's resolution of Claim PP(4).

DATED: August 25, 2017

_____
UNITED STATES DISTRICT JUDGE